# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

MELISSA SANDERS,           :
                           :
    **Plaintiff,**       :
                           :        **CIVIL ACTION FILE NO.**
**v.**                     :        **1:16-cv-04241-AJB**
                           :
**NANCY A. BERRYHILL,**    :
*Acting Commissioner, Social*  :
*Security Administration,*     :
                           :
    **Defendant.**     :

## O R D E R  A N D  O P I N I O N[1]

Plaintiff Melissa Sanders ("Plaintiff") brought this action pursuant to

section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review

of the final decision of the Commissioner of the Social Security Administration ("the

Commissioner") denying her application for Disability Insurance Benefits ("DIB")

under the Social Security Act.[2] For the reasons below, the undersigned **REVERSES**

_____

[1]    The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 11/16/16). Therefore, this Order constitutes a final Order of the Court.

[2]    Title II of the Social Security Act provides for federal Disability Insurance Benefits. 42 U.S.C. § 401 *et seq.* Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the disabled ("SSI"). Title XVI claims are not tied to the attainment of a particular period

the final decision of the Commissioner **AND REMANDS** the case to the Commissioner

for further proceedings consistent with this opinion.

I.    **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB on February 28, 2011, alleging disability

commencing on September 16, 2010.  [Record (hereinafter "R") 391].  Plaintiff's

applications were denied initially and on reconsideration. [*See* R177-79]. Plaintiff then

requested a hearing before an Administrative Law Judge ("ALJ"). [R213-14]. An

evidentiary hearing was held on January 10, 2013. [R53-109]. The ALJ issued a

decision on March 12, 2013, denying Plaintiff's application on the ground that she had

not been under a "disability" from the alleged onset date through the date of the

decision. [R180-96]. Plaintiff sought review by the Appeals Council, and on

May 29, 2014, the Appeals Council remanded for further consideration. [R197-99].

---

of insurance eligibility. *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982).
Otherwise, the relevant law and regulations governing the determination of disability
under a claim for DIB are nearly identical to those governing the determination under
a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005)
(citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).  In general, the
legal standards to be applied are the same regardless of whether a claimant seeks DIB,
to establish a "period of disability," or to recover SSI, although different statutes and
regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that
the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI).
Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they
are equally applicable to Plaintiff's DIB claims.

AO 72A
(Rev.8/8
2)

The ALJ started a second hearing on November 4, 2014, but rescheduled the matter in order to receive all of the medical evidence. [R110-20]. A third evidentiary hearing was held on March 17, 2015. [R121-76]. On June 9, 2015, the ALJ issued a decision denying Plaintiff's application on the ground that she had not been under a "disability" from the alleged onset date through the date of the decision. [R25-52]. Plaintiff again sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on October 27, 2016, making the ALJ's decision the final decision of the Commissioner. [R1-8].

Plaintiff then filed her action in this Court on November 14, 2016, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on March 15, 2017. [*See* Docs. 5, 6]. On April 20, 2017, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 11]; on May 22, 2017, the Commissioner filed a response in support of the decision, [Doc. 12]; and on June 2, 2017, Plaintiff filed a reply brief in support of her petition for review, [Doc. 13]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs,[3] and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

---

[3]     Neither party requested oral argument. (*See* Dkt.).

## II.    PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the issues to be decided are:

1.    Whether the ALJ reversibly erred by failing to properly explain why he did not fully credit the opinion of Keith Osborn, M.D., Plaintiff's treating orthopedic surgeon, as to her physical limitations.

2.    Whether the ALJ reversibly erred by failing to consider all of the relevant evidence of record in discounting the credibility of Plaintiff's allegations of pain and limitation.

[Doc. 11 at 10-28].[4]

---

[4]    Where the page numbers in Plaintiff's brief conflict with the numbers assigned by the Court's CM/ECF system, the Court will utilize the page numbers assigned by the CM/ECF system.

AO 72A
(Rev.8/8
2)

# III.  STATEMENT OF FACTS[5]

### A.  *Background*

Plaintiff can read and write in English, has a twelfth-grade education, and has

worked as a process server.  [R461-63].  Born on April 13, 1972, she was thirty-eight

years old on the alleged onset date and application date and was forty-one years old on

December 31, 2013, the date she was last insured.  [R178, 391].  Plaintiff alleges

disability due to back pain, neck problems, nerve damage in the neck and shoulders,

depression, radiculopathy,[6] panic attacks, and headaches.  [R61, 126, 462].

---

[5]    In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 11-13].  As the Court's scheduling order warned the parties that each statement of fact must be supported by reference to the page in the record where the evidence may be found, that "record citations should immediately follow each allegation of fact," and that "[t]he issues before the Court are limited to the issues properly raised in the briefs," [Doc. 8 at 2-3], broad statements of fact followed by generalized citations to a range of pages have been disregarded, [*see, e.g.*, Doc. 11 at 6-7].

[6]    Radiculopathy is an alternate name for a herniated (slipped) disk, which occurs when all or part of the softer center of a spinal disk is forced through a weakened part of the exterior of the disk, forming a protruding mass and placing pressure on nearby nerves.  Mayo Clinic, Herniated Disk, http://www.mayoclinic.org/diseases-conditions/herniated-disk/home/ovc-20271246 (last visited 3/7/18); MedlinePlus, Herniated Disk, http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

B.    *Lay Testimony*

Plaintiff stated that she spent her days at the house, getting "up and down" to change ice packs and to alleviate pain in her neck, back, and hips. [R139-40]. She stated that she was only able to sleep two or three hours per night. [R139]. She testified that her neck, back, and hip pain made it difficult to sit or stand for any period of time or to lift any weight. [R139-40, 144, 147-48]. She also reported tingling in her left arm that had begun when she had a spinal surgery in 2007 and had become worse since she had a second spinal surgery in 2012. [R151-52]. She stated that she experiences four headaches per week, each of them lasting two to six hours. [R153-54].

In terms of treatment, Plaintiff reported that she only attended a few physical therapy treatments, explaining that they caused her to be in more pain. [R144-45]. She had slowed the rate of receiving trigger-point shots from her pain specialist. [R145-46]. At the time, her medications included hydrocodone[7] for pain and Ambien[8] for sleep. [R149-50]. She reported that the intensity of her neck pain was usually around nine or

---

[7]    Hydrocodone is a narcotic analgesic medication used to relieve severe pain.    MedlinePlus, Hydrocodone, https://medlineplus.gov/druginfo/meds/a614045.html (last visited 3/7/18).

[8]    Ambien (zolpidem) is a sedative-hypnotic medication that is used to treat insomnia.    MedlinePlus, Zolpidem, https://medlineplus.gov/druginfo/meds/a693025.html (last visited 3/7/18).

6

ten on a ten-point scale but that using ice packs reduced her pain to five or four. [R157]. Plaintiff also stated that she had a TENS[9] unit but only sometimes used it because it would increase her pain. [R161].

As to daily activities, Plaintiff stated that she liked to watch CSI on television and to watch crime movies. [R155]. Plaintiff testified that she was able to drive her H2 Hummer four times per month, up to forty-five minutes at a time. [R128, 137, 174]. She had no problems with self-care except washing her hair. [R133-34]. Around the house, she could clean the floors with a light-weight dust mop and light-weight vacuum, load the dishwasher, wash laundry, and walk to the mailbox. [R134-35]. Plaintiff's sister helps her with the cleaning and dries the laundry, and Plaintiff's daughter does almost all of the grocery shopping. [R78-79, 134-35].

C.     *Administrative Records*

Plaintiff stated in a function report that she lived in a house with her daughter and spent her days keeping ice on her neck and rotating from sitting, to lying down, to walking in order to avoid pain. [R477]. She reported that she was no longer able to

---

        [9]     "TENS" is an acronym for transcutaneous electric nerve stimulation, which is a method to reduce pain with electrical impulses. Nat'l Osteoporosis Found., *P r o t e c t i n g   Y o u r   F r a g i l e   S p i n e* 11, *a v a i l a b l e   a t* https://cdn.nof.org/wp-content/uploads/2016/02/Protecting-Your-Fragile-Spine.pdf (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

jog, work out, or work because of her pain, that it hurt to wear a bra, and that she no longer styled her hair because she could not hold her arms up. [R478]. She stated that she was only able to use the microwave oven and that her daughter does the cooking and helps with the laundry and housework. [R478-79]. She reported that she could pay bills, count change, and handle a savings account. [R480].

D.    *Medical Records*

Plaintiff fell and injured her neck while she was working as a policewoman. [R613]. After conservative measures failed, on September 18, 2007, Dr. Osborn performed a partial vertebrectomy, C5-6 with spinal cord and foraminal decompression, and an anterior cervical discectomy at C6-7, with removal of large free fragments from the canal and foramen. [R613-14].

At a follow-up visit with Dr. Osborn taking place on October 17, 2007, Plaintiff reported that she was off narcotic pain medications and "doing a lot better." [R674]. Her x-rays showed good position of her hardware and bone grafts at C5-6 and C6-7. [R674]. Dr. Osborn noted that Plaintiff still had a "burning dysesthestic pain"[10] in her left arm that appeared to relate to chronic compression of her left C7 root, fairly dense

_____

[10]    Dysesthesia can refer to impairment of sensitivity to touch, to disagreeable sensation produced by ordinary stimuli, or to abnormal sensation experienced in the absence of stimulation. *PDR Med. Dictionary* 531 (1st ed. 1995).

8

AO 72A
(Rev.8/8
2)

numbness in the left index finger, and less dense numbness in the middle and ring fingers of the left hand. [R674]. He also observed that Plaintiff's strength had improved but was not back to normal. [R674]. Dr. Osborn started Plaintiff on Lyrica,[11] Celebrex,[12] and trazodone[13] for sleep difficulty and left-arm pain; started her on tizanidine[14] for muscle spasm in her left trapezius[15]; and stated that she would "remain out of work for now." [R674].

---

[11]     Lyrica (pregabalin) is used to relieve pain from damaged nerves. It works by decreasing the number of pain signals that are sent out by damaged nerves in the body. MedlinePlus, Pregabalin, https://medlineplus.gov/druginfo/meds/a605045.html (last visited 3/7/18).

[12]     Celebrex (celecoxib) is a nonsteroidal anti-inflammatory drug ("NSAID") that is commonly used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and spinal arthritis. MedlinePlus, Celecoxib, https://medlineplus.gov/druginfo/meds/a699022.html (last visited 3/7/18).

[13]     Trazodone is a serotonin modulator typically used to treat depression. MedlinePlus, Trazodone, https://medlineplus.gov/druginfo/meds/a681038.html (last visited 3/7/18).

[14]     Tizanidine is a skeletal muscle relaxant that is used to relieve the spasms and increased muscle tone caused by spinal injury. It works by slowing action in the brain and nervous system to allow the muscles to relax. MedlinePlus, Tizanidine, https://medlineplus.gov/druginfo/meds/a601121.html (last visited 3/7/18).

[15]     The trapezius is a large muscle located in the upper part of the back. Contraction of the muscle moves the shoulder blade in several different directions; when the trapezius muscle is engaged, the collarbone is generally raised. J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* T-217 (46th ed. 2012).

AO 72A
(Rev.8/8
2)

At another follow-up visit taking place on November 15, 2007, Plaintiff reported that she had to stop taking her medications because of swelling and that she was unable to sleep at night. [R675]. Her main complaint was pain in the left scapular and trapezius region and still fairly dense numbness in the left index finger and to lesser degree in the middle and ring fingers. [R675]. Dr. Osborn noted that Plaintiff was improving slowly, recommended that Plaintiff use the Lyrica and Celebrex, recommended that she continue rehabilitation services, and opined that Plaintiff was capable of part-time sedentary work. [R675]. He also noted that Plaintiff had contacted her chief and that he did not want her to return to work until she was released to full duty. [R675].

On January 16, 2008, Plaintiff returned to Dr. Osborn. [R520-21]. She had been fired from her job. [R520]. She complained of pain in her neck, left shoulder, and arm, and dysesthestic pains in the left arm and hand. [R520]. She reported that sitting for long periods caused her numbness and tingling to get worse, that she felt some burning in her left thumb and index finger, that her arms felt like they had no circulation, and that wearing a bra seemed to significantly worsen her symptoms. [R520]. Upon examination, Dr. Osborn observed that Plaintiff had pain at the extremes of range of

AO 72A
(Rev.8/8
2)

motion of her neck, there was still subluxation[16] and muscle spasm in the trapezius area, Plaintiff still had diminished coordination of the left arm, reflexes were diminished in the left biceps and triceps, there was decreased sensation in the left hand, and motor strength was still mildly diminished in the left arm compared to the right. [R520]. Dr. Osborn opined that Plaintiff appeared to be healed from an orthopaedic standpoint but that she "clearly ha[d] sustained some nerve injury from the pressure of the disk herniation against her spinal cord and exiting nerve roots" and it could "take some months or years to reach a point of maximum improvement and may or may not result in full recovery." [R520]. Dr. Osborn further opined, "I think she has significant impairment in her ability to work at this point, and this could be permanent. It is unfortunate[] that she has been fired from her job. She remains capable of only sedentary work and will benefit from pain management possibly with an epidural steroid injection." [R521].

On August 18, 2008, Plaintiff visited Anthony C. Carantzas, M.D., at Douglasville Resurgens Orthopaedics for follow-up of shoulder impingement on the right. [R777]. It was noted that she had an injection a couple of weeks earlier and that

---

[16] "Subluxation" refers to an incomplete dislocation, such as when one or more of the bones of the spine moves out of position. PDR Med. Dictionary 1693 (1st ed. 1995).

11

AO 72A
(Rev.8/8
2)

she had noticed significant improvement. [R777]. Dr. Carantzas stated that Plaintiff could work with limited use of the right arm, limited overhead work, and no heavy lifting. [R777].

Plaintiff visited psychologist David B. Adams, Ph.D., on June 3, 2009. [R690]. Dr. Adams noted that Plaintiff arrived in considerable bilateral neck and shoulder pain, with numbness of the first two fingers of her left hand, and was irritable and periodically tearful. [R690]. It was also noted that Plaintiff spent a lot of time with her daughter in a piece of rental property because she was too irritable to interact with her husband and that Plaintiff's family expressed frustration that she was sullen and withdrawn. [R690]. Plaintiff had symptoms of depression, anxiety, sleep disorder, irritability/impatience, and obsessive thoughts. [R690]. Dr. Adams diagnosed pain disorder associated with both psychological factors and Plaintiff's general medical condition and also diagnosed major depressive disorder with mild symptoms. [R690].

Physical therapist Alex Ghaffari completed an assessment of Plaintiff on December 14, 2009. [R882-86]. Mr. Ghaffari observed that Plaintiff demonstrated significantly decreased left-upper-extremity strength, decreased cervical-spine flexibility, forward head posture, and increased cervico-thoracic para-spinal muscle tightness. [R882]. She had partial functional range of motion in the left shoulder and

AO 72A
(Rev.8/8
2)

was unable to perform fine and gross grasping tasks, both at the table level and the shoulder level, utilizing the left arm. [R882]. Mr. Ghaffari concluded that Plaintiff (1) could perform fine and gross motor skills with her left arm only occasionally; (2) had difficulty sitting for about thirty to forty-five minutes but tolerated the pain; (3) had reduced range of motion in the left shoulder; (4) had limited active range of motion and joint mobility in the neck and upper thoracic area; (5) had to move constantly with her head in slight extension with decreased cervical lordosis[17] and rounded shoulders; (6) had decreased coordination, endurance, and strength in the left shoulder, neck, and thoracic spine; and (7) had high intensity pain in the neck and upper back with flexion/extension, and rotation. [R884-86]. Mr. Ghaffari opined that Plaintiff could do sedentary to light work but that she "would not be able to perform her job duty on a full time or sustained basis at . . . present." [R882]. The stated plan was physical therapy twice weekly for twelve weeks, a TENS unit for pain management at home, joint mobilization and manual therapy, cervical traction, acupuncture and dry

---

[17]     Cervical lordosis refers to the natural inward curve of the spine at the neck. Loss of the natural curve can cause neck pain, reduced range of motion in the neck, and problems with the nerve roots or spinal cord, which may lead to weakness in the arms or legs, loss of grip strength, or difficulty walking. Univ. of Maryland Med. Ctr., C e r v i c a l   K y p h o s i s , http://www.umm.edu/programs/spine/health/guides/cervical-kyphosis (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

needling for pain and muscle guarding, strength- and re-conditioning, and a home exercise program. [R886].

At a visit with Dr. Osborn taking place on December 16, 2009, Plaintiff continued to complain of neck and left-arm pain with weakness and atrophy in the left arm. [R1384]. An examination showed tenderness in the neck, reduced neck motion, exquisite tenderness to the left of the midline, diminished reflexes in the left biceps and triceps, some atrophy in her arm, and decreased sensation in the C6-7 distribution, but also a normal gait and station and no neck subluxations. [R1384]. X-rays of the cervical spine showed solid fusion at C5-6 and C6-7 with degenerative changes developing at C4-5 with anterior osteophytes[18] and uncovertebral joint hypertrophy.[19] [R1384]. Dr. Osborn noted that the results represented junctional deterioration but found that there were no symptoms to suggest that it was the primary source of Plaintiff's pain and instead diagnosed cervical radiculopathy and recommended a trial of acupuncture. [R713, 1384-85]. He also noted that Plaintiff was capable of sedentary work, defined as lifting a maximum of ten pounds, occasionally lifting and/or carrying

---

[18] An osteophyte is a bony outgrowth or protuberance. *PDR Med. Dictionary* 1270 (1st ed. 1995).

[19] "Hypertrophy" refers to abnormal enlargement. J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine, Illustrated* H-258, J-19-20 (46th ed. 2012).

AO 72A
(Rev.8/8
2)

articles such as dockets, ledgers, and small tools, and doing a "certain amount" of walking and standing. [R713].

An MRI of Plaintiff's cervical spine taken on December 4, 2010, revealed (1) interspace narrowing with spondylotic ridging[20] and a broad-based disc bulge at C4-5 causing moderate central canal and moderate bilateral foraminal stenosis[21]; and (2) interspace narrowing with spondylotic ridging and a broad based disc bulge together causing mild central canal stenosis and mild-to-moderate bilateral foraminal stenosis at C3-4. [R1347-48].

John G. Porter, M.D., a pain specialist, examined Plaintiff on February 22, 2011. [R1341]. Upon examination, Dr. Porter observed that Plaintiff's affect was depressed; upper-extremity reflexes could not be obtained at the triceps, biceps, or brachioradialis points bilaterally; strength was diminished on the left in grip strength, biceps, triceps,

---

[20]    "Spondylosis" refers to stiffening vertebra and is "often applied nonspecifically to any lesion of the spine of a degenerative nature." *PDR Med. Dictionary* 1656 (1st ed. 1995).

[21]    "Foraminal stenosis" is a narrowing of a nerve opening where a nerve root leaves the spinal canal. MedlinePlus, Foraminotomy, https://medlineplus.gov/ency/article/007390.htm (last visited 2/23/18). "Spinal stenosis" causes narrowing in the spinal canal, which in turn puts pressure on the nerves and spinal cord and can cause pain. MedlinePlus, Spinal Stenosis, https://medlineplus.gov/spinalstenosis.html (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

and deltoid testing; there was mild atrophy of the left forearm and upper arm; sensation was diminished in the index finger and third finger and to some degree in the thumb; there were trigger points in the trapezius on the left; range of motion was normal in flexion and in right turn; left turn was limited to forty-five degrees; and hyperextension caused Plaintiff to have numbness across her neck and upper back. [R1341]. Dr. Porter noted that he was concerned about a structural abnormality that might require surgical repair, opined that Plaintiff's pain was primarily neuropathic, and noted that ibuprofen had been ineffective and caused stomach upset. [R1341].

On August 23, 2011, Carl Sherrer, M.D., reviewed the record and opined that Plaintiff had the ability to lift and/or carry twenty pounds occasionally and ten pounds frequently; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could occasionally climb or crawl; could frequently balance, stoop, kneel, or crouch; could reach in all directions occasionally with both arms; and had a limited ability to feel, due to numbness in the index and third fingers of her left hand. [R1233-40].

AO 72A
(Rev.8/8
2)

Plaintiff returned to Dr. Porter on September 2, 2011. [R1246-48]. She reported that she was taking medications as prescribed and that Xanax[22] and hydrocodone were helping, but that she still had neck pain, tingling all the way to the fingers of her left hand, intermittent numbness and left-arm weakness, and now had pain in her right arm as well as her left. [R1246]. Dr. Porter noted that Dr. Osborn was considering a second fusion surgery above Plaintiff's prior fusion. [R1246]. He prescribed ibuprofen, topiramate,[23] nortriptyline,[24] fluoxetine,[25] and meloxicam.[26] [R1246]. He stated that

---

[22]     Xanax (alprazolam) is a benzodiazepine typically used to treat anxiety disorders and panic disorder. Medline Plus, Alprazolam, https://medlineplus.gov/druginfo/meds/a684001.html (last visited 3/7/18).

[23]     Topiramate, commonly prescribed under the brand name Topamax, is an anticonvulsant medication that is used to prevent migraine headaches but not to relieve the pain of migraine headaches when they occur. MedlinePlus, Topiramate, https://medlineplus.gov/druginfo/meds/a697012.html (last visited 3/7/18).

[24]     Nortriptyline is a tricyclic antidepressant medication. MedlinePlus, Nortriptyline, https://medlineplus.gov/druginfo/meds/a682620.html (last visited 3/7/18).

[25]     Fluoxetine, commonly prescribed under the brand name Prozac, is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression, obsessive-compulsive disorder, some eating disorders, and panic attacks. MedlinePlus, Fluoxetine, https://medlineplus.gov/druginfo/meds/a689006.html (last visited 3/7/18).

[26]     Meloxicam, commonly prescribed under the brand name Mobic, is an NSAID medication often used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. MedlinePlus, Meloxicam, https://medlineplus.gov/druginfo/meds/a601242.html (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

he doubted that repeated injection therapy or physical therapy would make a substantive difference in Plaintiff's condition and stated that he would refill Plaintiff's medication as he "really ha[d] nothing else to offer her beyond this." [R1247].

Plaintiff reported to Dr. Osborn on September 12, 2011, for follow up. [R1289]. She complained of continued pain in her neck that went into both arms, more on the left than the right, and of numbness in her left arm. [R1289]. It was noted that Plaintiff was prescribed Ambien, Lortab,[27] and Xanax through Dr. Porter and that she had received "a lot of relief" from massage therapy, more than from rehabilitation, and had received some relief from acupuncture. [R1289]. It was noted that a review of systems was negative for neurological or musculoskeletal complaints. [R1289]. She had some tenderness and reduced motion in the neck, but she had normal gait, no clear motor or reflex deficits, no overt myelopathy, and normal lower extremities. [R1289]. The impression given was known C4-5 spondylosis with neural compression. [R1289]. Dr. Osborn stated that although he believed Plaintiff would need additional surgery, he would for now continue with conservative measures of massage therapy, a trial of

---

[27] Lortab is an opioid pain medication that contains a combination of acetaminophen and hydrocodone and is used to relieve moderate to severe pain. Drugs.com, Lortab, http://www.drugs.com/lortab.html (last visited 3/7/18).

18

AO 72A
(Rev.8/8
2)

acupuncture, supportive counseling through Dr. Adams, and medication management through Dr. Porter. [R1289].

On December 7, 2011, Plaintiff sought help on an emergency basis from Dr. Porter for severe right-neck pain that had persisted for three days and was radiating to her upper back, shoulder blade, and left arm, with a burning, numbing sensation in her left biceps, index, and third fingers on the left. [R1432]. Her strength was decreased on the left as was her sensation in a C6 distribution, and her cervical range of motion was diminished in turning, flexion, and extension. [R1433]. Dr. Porter instituted muscle relaxant therapy with tizanidine, refilled alprazolam, and continued meloxicam and zolpidem. [R1433]. Dr. Porter also wrote that the best he could do was provide palliative management with trigger-point injections and muscle-relaxant therapy and hope that Dr. Osborn had a surgical remedy. [R1432-33].

Plaintiff returned to Dr. Osborn for follow up on December 12, 2011. [R1497-98]. She complained of increasing pain in her neck that radiated into her right arm and would go into the shoulder and down into her hand sometimes. [R1498]. Dr. Osborn noted that Plaintiff would like to continue to try to avoid surgery and would work with Dr. Porter but that if her symptoms worsened, surgery would be indicated. [R1498]. Plaintiff was also prescribed a soft cervical collar to help control her pain.

19

[R1498]. Dr. Osborn noted that Plaintiff was only capable of part-time sedentary work. [R1497].

On December 22, 2011, Plaintiff returned to Dr. Adams for the first time in two and one-half years. [R1445]. It was noted that Plaintiff was divorced; was angry, sullen, and frustrated; was in a contentious and ongoing battle with her ex-husband; had financial limitations; and was fearful of an additional surgery, which she had been postponing. [R1445]. She was observed to exhibit symptoms of depression, anxiety, sleep disorder, problems with concentration, irritability and/or impatience, intrusive thoughts, and obsessive thoughts. [R1445]. It was noted that Plaintiff recurrently discontinued needed psychological care each time her depression abated due to the care and that she shunned dependency. [R1445]. Dr. Adams again diagnosed pain disorder associated with both psychological factors and general medical condition and also diagnosed major depressive disorder (single episode, moderate). [R1445].

Plaintiff again returned to Dr. Adams on January 11, 2012. [R1446]. She reported that her neck pain had worsened and that she had researched the recommended surgical procedure and did not wish to pursue it. [R1446]. She was observed to exhibit symptoms of depression, anxiety, sleep disorder, irritability and/or impatience, obsessive thoughts, compulsive behaviors, and problems with concentration and recent

20

memory. [R1446]. Dr. Adams again diagnosed pain disorder associated with both psychological factors and general medical condition and major depressive disorder (single episode, moderate). [R1446].

Plaintiff returned to Dr. Porter on February 7, 2012, with complaints of left-back and neck pain with radiating left-arm pain. [R1441]. Plaintiff reported that physical therapy was not really helping her, that massage therapy was helpful for a day or so, and that a TENS unit seemed to help with her pain. [R1441]. On examination, reflexes could not be obtained on the left at the triceps, biceps, or crachioradialis points; strength was slightly diminished on the left in biceps and grip testing; sensation was slightly decreased in the left C6 distribution; range of motion was decreased in turning and extension; and examination of the back revealed left trapezius and rhomboid trigger points. [R1442]. Dr. Porter noted Plaintiff was stable and compliant with medication usage; refilled her medications; discontinued physical therapy because it was not helping; injected trigger points in the left trapezius and rhomboid muscle; and suggested that a facet rhizotomy[28] might be indicated, pending results of diagnostic

---

[28]    Rhizotomy is a procedure where a surgeon cuts spinal nerve roots for relief of pain or spastic paralysis. *PDR Med. Dictionary* 1546 (1st ed. 1995).

21

AO 72A
(Rev.8/8
2)

facet joint injections,[29] and could help her move forward without requiring additional surgical intervention. [R1442-43].

Plaintiff presented to a physician's assistant at Dr. Osborn's practice on February 9, 2012, complaining of headaches; persistent neck and upper-back pain; left-arm pain, numbness, and weakness; and some mid-back pain. [R1493-95]. She reported that despite taking Ambien, Mobic, Lortab, Xanax, and Topamax, the pain was nine on a ten-point scale. [R1493]. On examination, Plaintiff had tenderness to palpation in the neck and shoulders and restricted flexion, extension, rotation, and lateral bending with pain, but she also had normal gait and alignment, full strength, normal coordination and balance, intact reflexes, normal sensation, and full bilateral shoulder motion without pain. [R1493-94]. It was noted that Dr. Porter was scheduled

_____

[29]     Facet joints are situated between the stacked vertebrae and typically lie behind the spinal nerves as the emerge from the central spinal canal. The two facet joints and intervertebral disc at each level of the spine allow for motion between the vertebral bodies. KnowYourBack.org., Anatomy of the Spine (Bones), https://www.spine.org/KnowYourBack/Resources/AnatomySpine (last visited 3/7/18). Facet joint pain can be diagnosed with local anesthetic blocks of the medial branches or of the facet joints themselves. David S. Binder & Devi E. Nampiaprarmpil, The Provocative Lumbar Facet Joint, *Curr. Rev. Musculoskeletal Med.*, Abstract, *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2684949 (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

to perform facet injections[30] with a possible ablation procedure[31]; Dr. Osborn recommended additional fusion surgery of the cervical spine; Plaintiff wanted to wait on the surgery until the summer when her daughter was out of school; and Plaintiff would continue with her medicines per Dr. Porter. [R1494]. Plaintiff's work status was "unchanged." [R1494].

An MRI taken on September 24, 2012, revealed multilevel degenerative disc disease most pronounced at C4-5, with right greater than left neural foraminal narrowing at C3-4 and left-sided neural foraminal narrowing at C4-5. [R1573-74].

At an appointment taking place on October 10, 2012, Dr. Osborn noted that Plaintiff's progressive arm numbness and weakness and her neck pain related to cord compression with herniated disks at C3-4 and C4-5 and opined that Plaintiff should have another cervical fusion. [R1572]. Plaintiff agreed. [R1572]. The same day,

---

[30] Facet injections involve injection of steroids and local anesthetic into the facet joints to determine if it is a source of pain or to reduce pain and inflammation. KnowYourBack.org, Spine Definitions A-Z, Facet Injection, https://www.spine.org/KnowYourBack/Resources/Definitions (last visited 3/7/18).

[31] In this context, ablation is a procedure used to destroy the function of nerve tissue, thereby decreasing pain signals from that specific area. WebMD, Radiofrequency Ablation for Arthritis Pain, https://www.webmd.com/pain-management/radiofrequency-ablation#1-2 (last visited 3/7/18); *PDR Med. Dictionary* 3 (1st ed. 1995).

AO 72A
(Rev.8/8
2)

Dr. Osborn also opined Plaintiff could do sedentary work with restrictions, pending approval for surgery. [R1663].

Plaintiff complained to Dr. Porter on November 13, 2012, of increased neck and back pain. [R1592]. She described a deep and aching pain in her neck, upper back, and left arm, which was worsened with coughing, activity, and bowel movements. [R1592]. She also reported that her arm felt weak and tingly. [R1592]. It was noted that Plaintiff was only using medication "on occasion" because she did not like medication in general, that she was using her TENS unit occasionally, and that she was using cold packs. [R1592]. Dr. Porter stated that he had "nothing to offer the patient today except reassurance" and that he did not think additional trigger-point injections were warranted or would help her. [R1593]. He recommended that Plaintiff continue her TENS unit therapy and cold packs until she could have her surgery. [R1593].

On November 30, 2012, Dr. Osborn performed a C3-4, C4-5 discectomy, spinal cord decompression, and fusion. [R1699, 1725].

Plaintiff returned for a follow-up visit to Dr. Osborn on February 6, 2013, with complaints of persistent neck and upper-back pain and some left-upper-arm pain. [R1698]. She noted hypersensitivity, burning pain in the neck and upper-back area, continued headaches, recurrent numbness and weakness in both arms, and pain

24

AO 72A
(Rev.8/8
2)

averaging eight on a ten-point scale. [R1698]. Upon examination, it was noted that Plaintiff's range of motion of the cervical spine was restricted with pain; sensation and reflexes of upper extremities were unchanged from pre-op; and Plaintiff had diffuse tenderness and sensitivity over the neck and upper back. [R1698]. She was also observed to have full strength in her upper extremities, and her surgical hardware was intact. [R1698]. She was started on gabapentin,[32] her Ambien prescription was renewed, and it was noted that she would continue to receive her pain medication from Dr. Porter. [R1698]. It was also noted that Plaintiff remained unable to work. [R1698].

Plaintiff returned to Dr. Porter on April 23, 2013. [R1827]. Dr. Porter observed that Plaintiff's affect was depressed and that upon examination, her range of motion was reduced in turning; she had pronounced tightness of the trapezius muscles bilaterally and diffuse pain and tenderness; upper extremity reflexes of 0-1 + at triceps, biceps, and brachioradialis points bilaterally; diminished strength on the left; and normal sensation in the arm with the exception of the index and third finger. [R1827]. Dr. Porter gave Plaintiff trigger-point injections and began weaning her medication

_____

[32]     Gabapentin, also known by the brand name Neurontin, is often used to relieve nerve pain. MedlinePlus, Gabapentin, https://medlineplus.gov/druginfo/meds/a694007.html (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

other than her sleep medication because it was not helping. [R1828]. He also opined that Plaintiff was at maximal medical improvement with no other treatment options and that she was capable of working in a sedentary capacity "but will not do well at present with any significant lifting or arm movements especially over her head." [R1828].

A neurological examination conducted by Dr. Osborn on June 12, 2013, indicated decreased sensation in both hands. [R1710]. Dr. Osborn also noted some discomfort and pain with range of motion of Plaintiff's neck and mild aggravation with a Phalen test.[33] [R1710]. It was noted that she was capable of sedentary work. [R1710].

At a visit taking place on July 17, 2013, Plaintiff complained to Dr. Osborn of persistent neck and upper-back pain, bilateral arm pain, and weakness and numbness in both arms. [R1707]. It was noted that she had been involved in a motor-vehicle accident on June 20, 2013, and that she had been struck on the passenger side, which totaled her car and caused a soft-tissue injury. [R1707]. Plaintiff reported that her pain had worsened in the arms with increased burning in both arms down to the hands and

---

[33]     The Phalen test (bending the wrist all the way forward for sixty seconds to see if numbness, tingling or weakness results) is commonly used to determine whether a patient has carpal tunnel syndrome. MedlinePlus, Carpal Tunnel Syndrome, http://www.nlm.nih.gov/medlineplus/ency/article/000433.htm (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

diminished range of motion in her cervical spine and upper back. [R1707]. She described the pain as a constant, throbbing ache that varied in intensity and was presently at eight on a ten-point scale. [R1707]. An examination by Dr. Osborn showed that Plaintiff had tenderness over the right and left trapezius and paracervical and parathoracic musculature; restricted flexion, extension, rotation, and lateral bending with pain; normal gait; full strength; and intact coordination, sensation, and reflexes. [R1707-08]. She was restarted on gabapentin, and a nerve-conduction study was recommended. [R1708]. Dr. Osborn opined that Plaintiff's work status "remain[ed] unchanged with sedentary work." [R1709].

Plaintiff returned to Dr. Porter on July 25, 2013, with complaints of increasing right-neck pain, upper-back pain, and bilateral arm pain. [R1844]. She also reported a sense of tingling in her thumbs and index fingers and a decreased ability to turn her head and neck. [R1844]. She rated her pain at ten on a ten-point scale. [R1845]. On examination, Dr. Porter noted that Plaintiff's affect was depressed; strength appeared diminished in biceps and grip testing on the left; sensation was intact; and right trapezius trigger points were present. [R1845]. Dr. Porter proceeded with trigger-point injections at three points in the right trapezius muscle. [R1845].

AO 72A
(Rev.8/8
2)

An EMG/nerve conduction study[34] conducted on October 30, 2013, confirmed left-sided cervical radiculopathy but no evidence of carpal tunnel or other peripheral nerve entrapment. [R1705, 1729]. On examination, Dr. Osborn found that Plaintiff had diminished right-side range of motion compared to the left, some decreased sensation in the left index and little finger but no clear weakness, and mild reflex changes. [R1705]. He recommended trying physical therapy again with a new physical therapist. [R1705].

Plaintiff returned to Dr. Porter on January 14, 2014, with complaints of neck pain and upper-back pain, with the pain worse on the left than the right. [R1840]. She requested trigger-point injections. [R1840]. Dr. Porter noted that Plaintiff's medications included diclofenac[35] once per day, tizanidine at night, alprazolam at night,

---

[34] "EMG" is an abbreviation for electromyogram. *PDR Med. Dictionary* 569 (1st ed. 1995). Electromyography measures the response of muscles and nerves to electrical activity. It is used to help determine conditions that might be causing muscle weakness, such as nerve disorders. KidsHealth, Electromyography, http://kidshealth.org/parent/general/sick/emg.html (last visited 3/7/18).

[35] Voltaren (diclofenac) is an NSAID medication used to relieve mild to moderate pain. MedlinePlus, Diclofenac, https://medlineplus.gov/druginfo/meds/a689002.html (last visited 3/7/18).

28

AO 72A
(Rev.8/8
2)

and rarely hydrocodone. [R1838]. He assessed myofascial pain syndrome[36] and cervical postlaminectomy syndrome.[37] [R1840]. He opined that Plaintiff was not cognitively impaired and could "work with her brain" but would have difficulty using her arms in police work. [R1840].

On May 20, 2014, Plaintiff returned to Dr. Porter with complaints of left-neck pain, intrascapular pain, upper-back pain, and arm pain. [R1841]. Dr. Porter noted that she had persistent neck and radiating left-arm pain with numbness into the index finger and thumb of the left hand; that she described the pain as burning, tingling, electric, and throbbing; and that she reported increasing symptoms of depression. [R1841]. He diagnosed cervical radicular pattern pain, left-C6 distribution, with EMG-documented

---

[36]    Mysofacial pain syndrome is a chronic pain disorder. In myofascial pain syndrome, pressure on sensitive points in the muscles (trigger points) causes pain in seemingly unrelated parts of the body. This is called referred pain. Myofascial pain syndrome typically occurs after a muscle has been contracted repetitively. This can be caused by stress-related muscle tension. Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/myofascial-pain-syndrome/symptoms-causes/syc-20375444 (last visited 3/7/18).

[37]    Post-laminectomy syndrome (also called "failed back syndrome") refers to the persistence of pain and disability following spinal surgery. Frequent causes include returning disc herniation, nerve-root compression, scar-tissue build-up (fibrosis), joint hypermobility, spinal instability, and facet joint problems. Wake Spine & Pain, Post-laminectomy Syndrome, https://wakespine.com/knowledge-center/conditions-treated/post-laminectomy-syndrome (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

neuropathy; started topirimate and bupropion[38] with the goal of controlling Plaintiff's neuropathic pain; refilled zolpidem for occasional help with sleep; and opined that Plaintiff could do sedentary work "and probably light duty work." [R1843].

Dr. Osborn completed a medical-source statement on October 1, 2014. [R1682-87]. He noted that Plaintiff had a significant limitation in her cervical range of motion and approximately four times per month had associated severe headache pain, which would last about two hours and cause exhaustion and an inability to concentrate. [R1682-83]. He opined that Plaintiff could only walk two to three blocks, sit for one hour at a time, and stand thirty minutes at a time; needed to shift positions at will; could sit for six hours of an eight-hour workday; could stand or walk for two hours of an eight-hour workday; could occasionally lift less than ten pounds; could rarely twist, stoop/bend, crouch/squat, or climb stairs; would require unscheduled breaks every couple of hours during the workday to lie down for about ten minutes; could rarely look up; could occasionally look down, turn her head in either direction, or hold it in a static position; could use her hands to grasp objects thirty percent of the time; could finely manipulate and reach in front of her body fifty percent of the time;

_____

[38]    Bupropion, also known by the brand name Wellbutrin, is an antidepressant that works by increasing certain types of activity in the brain. MedlinePlus, Bupropion, https://medlineplus.gov/druginfo/meds/a695033.html (last visited 3/7/18).

30

could reach overhead less than five percent of the time; would be off task ten percent of the workday; would miss approximately four days of work per month; and was capable of only low-stress work. [R1684-86]. Dr. Osborn also opined that Plaintiff's depression and anxiety affected her physical condition. [R1684, 1686].

Dr. Porter completed a medical-source statement on October 9, 2014. [R1689-94]. He stated that Plaintiff had chronic pain and paresthesia[39]; that she had constant tingling, throbbing, burning pain in her upper back and arm; that her impairments were characterized by muscle spasm, muscle weakness, sensory changes, and motor loss; that she had significant cervical range of motion limitations as well as significant limitations with reaching, handling, or fingering; that she had decreased left-arm and left-upper-back strength and other numbness in the C5-6 distribution; that depression and anxiety contributed to Plaintiff's limitations; and that she was likely to continue to have persistent pain and dysfunction. [R1689-94]. He also opined that

---

[39]     Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet, but can also occur in other parts of the body. It is usually painless and described as tingling or numbness, skin crawling, or itching. Nat'l Instit. of Neurological Disorders & Stroke, Paresthesia Information Page, https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

Plaintiff was capable of tolerating moderate stress and the stress of normal work. [R1693].

On January 14, 2015, Plaintiff returned to Dr. Osborn with complaints of worsening neck pain and swelling. [R1876]. She reported that she had started neuromuscular therapy, which she had to pay for herself but which resulted in less pain and swelling. [R1876]. Authorization for physical therapy had not yet been obtained. [R1876]. It was noted that Plaintiff had to discontinue Topamax after developing kidney stones. [R1876]. On examination, Dr. Osborn noted that there was some tenderness in the neck; range of motion in the neck was restricted; upper and lower extremity reflex, sensory, and motor exams showed mild sensory changes in the arms but otherwise no deficits; and Plaintiff had normal gait and station. [R1876]. Dr. Osborn stated that he did not have a good explanation for Plaintiff's increased symptoms and opined that Plaintiff was capable of returning to sedentary work. [R1876, 1878].

Dr. Osborn examined Plaintiff again on February 9, 2015. [R1884-85]. She had tenderness in the neck and shoulders; restricted flexion, extension, rotation, and lateral bending with pain; decreased sensation in the left hand; but she also had full strength, except for mildly reduced left-hand grip and finger strength; normal coordination,

32

balance, and right-hand sensation; and intact reflexes with full shoulder range of motion. [R1885]. It was noted that Plaintiff could perform sedentary work with Dr. Porter's restrictions. [R1878, 1885].

On February 2, 2015, Plaintiff underwent another MRI of the cervical spine. [R1880-81]. The impression given was mild-to-moderate right paramedian disc protrusion causing ventral cord indentation and edema at C4-5 and C5-6. [R1880-81].

### E.    Vocational-Expert Testimony

A vocational expert ("VE") also testified at the hearing before the ALJ. The VE characterized Plaintiff's past work as that of a process server (light, semi-skilled work, as it is typically performed, and medium work, as Plaintiff performed it) and testified that a person limited to sedentary work could not perform it. [R163-64, 168]. When asked about the working capabilities of a younger individual with a high-school education, who was limited to work at a sedentary level; lifting or carrying ten pounds occasionally and less than ten pounds frequently; standing or walking two hours and sitting six hours; occasionally pushing and pulling with the arms; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; frequently balancing, stooping, kneeling, or crouching; occasionally crawling; occasionally overhead reaching with both arms; and frequently fingering with the left hand; and would need

33

to avoid hazards, moving mechanical parts, and high, exposed places, the person would be capable of working as a clerk in the food-and-beverage industry, a cashier, or a cuff folder. [R168-70]. The VE further testified that if the person would miss one or more days of work per month, all work would be precluded. [R171]. Additionally when asked about the working capabilities of a person forty-two years of age who could, in an eight-hour day, sit for one hour, stand for thirty minutes at a time, stand for about two hours, and sit for at least six hours, but has problems sitting for more than one hour at a time; would need to shift positions at will from sitting to standing or walking; would need to walk for a ten-minute period each hour; would need to take unscheduled breaks every couple of hours, lasting at least ten minutes; and occasionally would need to lie down, the VE testified that no jobs would be available in the national economy. [R173-74].

## IV.  ALJ'S FINDINGS

In the decision presently on appeal, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2013.

2.    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of September 16, 2010

34

through her date last insured of December 31, 2013 (20 CFR 404.1571 *et seq.*).

3.    Through the date last insured, the claimant had the following severe impairments: degenerative disc disease cervical spine, cervical radiculitis, and mild left carpal tunnel syndrome (20 CFR 404.1520(c)).

. . .

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

. . .

5.    After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a reduced range of sedentary work 20 CFR 404.1567(a).  The claimant can lift and/or carry 10 pounds occasionally, and can lift and/or carry less than 10 pounds frequently; can stand and/or walk 2 hours total in an 8-hour workday; can sit 6 hours total in an 8-hour workday; occasional pushing and pulling of both arms; occasional climbing ramps/stairs, but must avoid climbing ladders, ropes, scaffolds; frequent balancing, stooping, kneeling, crouching, occasional crawling; occasional reaching with both arms overhead; frequent fingering with the left hand; and must avoid hazards, moving, mechanical parts, and high, exposed places.

. . .

AO 72A
(Rev.8/8
2)

6.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

. . .

7.     The claimant was born on April 13, 1972 and was 41 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Through the date[] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

. . .

11.    The claimant was not under a disability, as defined in the Social Security Act, at any time from September 16, 2010, the alleged onset date, through December 31, 2013, the date last insured (20 CFR 404.1520(g)).

[R28-45].

AO 72A
(Rev.8/8
2)

## V.     STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274,

1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity

38

to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI. SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that

39

AO 72A
(Rev.8/8
2)

of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is

40

substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII. CLAIMS OF ERROR

As noted above, Plaintiff raises two allegations of error: (1) the ALJ reversibly erred by failing to properly explain why he did not fully credit the opinion of Dr. Osborn, and (2) the ALJ reversibly erred by failing to properly consider all of the relevant evidence of record in discounting the credibility of Plaintiff's allegations of limitation. [Doc. 11 at 10-28]. The Court first considers the arguments regarding the ALJ's consideration of Dr. Osborn's opinion and then turns to the credibility arguments.

### A. *Opinion of Dr. Osborn*

In evaluating the opinion evidence, the ALJ stated that he gave substantial weight to Dr. Osborn's opinions that Plaintiff could return to sedentary work because they were consistent with the record. [R40, 43, 1878, 1828]. He also acknowledged the medical-source statement Dr. Osborn completed on October 1, 2014, but stated that he did not credit the portion of it in which Dr. Osborn opined that Plaintiff would miss

41

four days of work per month, [R1686], because the ALJ found that the absence opinion was not consistent with Dr. Osborn's other notes in which he opined that Plaintiff could return to sedentary work or with records showing that Plaintiff's condition had not resulted in loss of strength or atrophy of muscles, [R40, 1698, 1494, 1885]. The ALJ also acknowledged that Dr. Osborn had opined in November 2007 that Plaintiff was unable to work, [R684, 686], and explained that he accorded little weight to the opinion because working capability is an issue reserved for the Commissioner and the opinion was inconsistent with Dr. Osborn's own notes and the medical record as a whole, [R43].

Plaintiff takes issue with several of the ALJ's explanations for his treatment of Dr. Osborn's opinions. First, Plaintiff argues that the ALJ made unwarranted assumptions when he presumed (1) that Dr. Osborn's statements that Plaintiff was capable of performing sedentary work did not merely mean that Plaintiff was capable only of the exertional requirements of sedentary work but instead that Dr. Osborn adopted the Agency's definition of capability of performing sedentary work, which implies that Dr. Osborn believed not only that Plaintiff could perform the exertional requirements of sedentary work but that she could perform them on a regular and continuous basis, [Doc. 11 at 11], and (2) that there were not also significant

42

non-exertional limitations as well, [*id*. at 12]. Second, Plaintiff contends that the ALJ's explanation that missing four days of work is not consistent with the absence of loss of strength or atrophy of muscles is not a valid reason to discount the opinion, as the record contains multiple findings and opinions of diminished strength and sensory changes, a diagnosis of pain disorder, and Plaintiff's consistent complaints to her medical providers of intense pain, and the ALJ does not explain why a loss of strength or atrophy of muscles is necessary to justify four absences. [*Id*. at 12-13]. Third, Plaintiff argues that because Dr. Osborn was a treating physician; Dr. Osborn's opinion was well-supported and not inconsistent with the other evidence of record, including the opinions of Dr. Porter, record-reviewer Dr. Sherrer, and therapist Mr. Ghaffari; and the ALJ did not set forth reasons for rejecting any portion of it other than the opinion that Plaintiff would miss work approximately four days per month, the ALJ erred by failing to include in the RFC all of the non-exertional limitations stated in Dr. Osborn's opinion. [*Id*. at 13-21 (*comparing* [R33] (RFC) *with* [R1682-87])]. Fourth, Plaintiff argues that the omissions are harmful because the omitted limitations preclude the

AO 72A
(Rev.8/8
2)

ability to work as a cashier, order clerk, or cuff folder, "or any work at all."[40, 41] [Doc. 11 at 21-24].

The Commissioner, in response, contends that substantial evidence supports the weight the ALJ gave to the record medical opinions. [Doc. 12 at 9-18]. She concedes that the ALJ did not use the word "weight" to discount Dr. Osborn's medical-source statement but avers that the ALJ nevertheless properly discounted the medical-source statement by articulating reasons for not accepting it. [*Id*. at 9-13 & n.2]. She further contends that the only opinions of Dr. Osborn to which the ALJ assigned substantial weight were Dr. Osborn's opinions that Plaintiff could do sedentary work, [R40, 43],

---

[40]     Plaintiff also mentions her inability to perform her past work. [Doc. 11 at 19]. It is unclear why, given that the ALJ agreed that she was not capable of performing her past work. [R43]. Thus, the Court finds the issue moot and gives it no further consideration.

[41]     Plaintiff further argues in this section that the ALJ erred when, after remand from the Appeals Council, he added Plaintiff's mild left carpal tunnel syndrome to Plaintiff's severe impairments to his most recent decision but left the manipulative limitations unchanged. [Doc. 11 at 23 (comparing [R33] with [R187])]. It is unclear how this argument relates to Plaintiff's allegation that the ALJ erred in his consideration of Dr. Osborn's medical-source statement. More to the point, Plaintiff has not raised any argument or cited any evidence indicating that the carpal-tunnel diagnosis was connected with limitations that were not included in the RFC. The mere existence of an impairment does not reveal the extent to which it limits the claimant's ability to work. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005). The Court therefore finds no basis for reversal in the argument.

44

and that the ALJ was correct in doing so, as substantial evidence supports that decision. [Doc. 12 at 13]. Next, the Commissioner argues that Plaintiff's contention that the ALJ made "unwarranted assumptions" based on Dr. Osborn's opinions that Plaintiff could do sedentary work is without merit because Plaintiff carries the burden of producing evidence showing that Dr. Osborn believed she could not work full time, and she cannot make such a showing. [*Id*. at 13-14]. The Commissioner also argues that Plaintiff cannot leverage her own complaints of pain to support Dr. Osborn's opinion regarding her expected absences because the ALJ properly found that her complaints of pain were not entirely credible. [*Id*. at 14]. The Commissioner additionally contends that Plaintiff's reliance on Dr. Porter's findings is unavailing because Dr. Porter opined that Plaintiff could do sedentary or light work, Dr. Porter's findings otherwise contradict Dr. Osborn's medical source statement, and Plaintiff's argument is, in essence, an improper request to reweigh the evidence. [*Id*.]. The Commissioner then argues that the ALJ considered the evidence Plaintiff cites regarding her neck, shoulder, and arm pain and included appropriate limitations in the RFC and that citations to various diagnoses, without more, do not show that greater limitations were warranted. [*Id*. at 15]. Additionally, the Commissioner argues that although the ALJ gave "great weight" to Mr. Ghaffari's opinion that Plaintiff could do sedentary work, the ALJ was

AO 72A
(Rev.8/8
2)

not required to consider any additional limitations in Mr. Ghaffari's opinion because the opinion was stale and because Mr. Ghaffari was not an acceptable medical source and his other findings therefore were not "medical opinions" the ALJ was required to weigh. [*Id*. at 15-16].

After careful consideration of the ALJ's decision, the parties' arguments, and the evidence of record, the Court concludes that the ALJ did err in his consideration of the medical-source statement supplied by Dr. Osborn. "[T]he ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," such that the reviewing court may determine "whether the ultimate decision on the merits is rational and supported by substantial evidence." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (punctuation omitted). Moreover, where an ALJ gives the opinion of a treating physician less than substantial or controlling weight, he must clearly articulate reasons establishing good cause for doing so. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Somogy v. Comm'r of Soc. Sec.*, 366 Fed. Appx. 56, 63 (11th Cir. Feb. 16, 2010) (citing *Lewis*, 125 F.3d at 1440)); SSR 96-2p, 1996 WL 374188.[42] Good cause exists when: (1) the treating physician's

---

[42]     Although 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2) have been superceded and SSR 96-2p has been rescinded, they remain applicable to cases filed prior to March 27, 2017. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2017); Corrected

AO 72A
(Rev.8/8
2)

opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). Failure to articulate the reasons for giving less weight to the opinion of a treating physician is reversible error. *Lewis*, 125 F.3d at 1440.

The ALJ explained that he did not assign weight to Dr. Osborn's opinion that Plaintiff would miss about four days of work per month because of her impairment/treatment because he found the opinion to be inconsistent with treatment records showing that Plaintiff's condition had not resulted in atrophy or loss of strength and that Plaintiff was capable of returning to sedentary work. [R40, 1494, 1698, 1828, 1878]. Setting aside whether it would be necessary for the record to show weakness or atrophy in order to bolster Dr. Osborn's opinion regarding Plaintiff's likely absences, a presumption the Court finds questionable at best, the Court notes that the ALJ reached his conclusion only by mischaracterizing or outright ignoring medical evidence: as Plaintiff points out, the record is replete with examination notes of weakness and diminished strength, [R745, 754, 762, 823, 827, 1279 (2008); R743, 746 (2009); R900, 1247, 1358, 1365, 1393, 1396, 1401 (2010); R1288, 1291, 1298, 1301, 1305, 1309,

_____

Not. of Rescission, SSR 96-2p, 2017 WL 3928297 (Apr. 6, 2017).

47

1316, 1341, 1404, 1418, 1433 (2011); R1559, 1564, 1593 (2012); R1827, 1833, 1845 (2013); R1717-20 (2014); R1872 (2015); R1689-90 (Dr. Porter's opinion); R1374 (Mr. Ghaffari's opinion)[43]], and sensory changes, [R745, 754, 762, 823, 827, 1279 (2008); R743, 746, 1055, 1390 (2009); R900, 1183, 1247, 1358, 1365, 1393, 1401 (2010); R1291, 1298, 1301, 1305, 1309, 1316, 1341, 1404, 1418, 1433 (2011); R1559, 1564, 1570, 1593, 1607 (2012); R1827, 1830, 1836 (2013); R1704, 1842 (2014); R1689-90 (Dr. Porter's opinion)], as well as findings of atrophy, [R1055, 1384 (2009), 1341, 1842 (2011)], and diagnoses of pain disorders, [R690, 1247, 1298, 1301, 1305, 1309, 1358, 1365, 1418, 1445, 1446, 1833, 1845].  And while the record does contain notes indicating that Dr. Osborn, Dr. Porter, and Mr. Ghaffari opined on a number of occasions that Plaintiff was capable of performing some range of sedentary or light work, it also contains evidence that Dr. Osborn's, Dr. Porter's, Mr. Ghaffari's, and other medical providers' notes were not intended to imply that Plaintiff was capable of performing the range of sedentary work set forth in the RFC on a sustained basis:  on March 11, 2008, Dr. Porter opined that Plaintiff would be capable of performing

---

[43] It is true that Mr. Ghaffari's opinion is not an opinion of an "acceptable medical source" and that the ALJ was not required to weigh Mr. Ghaffari's opinions as "medical opinions." *See* 20 C.F.R. § 404.1527(f)(1).  Nevertheless, it was necessary for the ALJ to consider the opinion, *see id.*, and in doing so, the ALJ assigned the opinion "substantial weight," without caveat.  [R37].

AO 72A
(Rev.8/8
2)

light-duty work for a full eight-hour day but should not be required to lift more than ten pounds occasionally and must be able to sit or stand at will, [R823]; on April 15, 2008, Dr. Osborn seconded the opinion, [R823]; on April 28, 2008, Dr. Carantzas restricted Plaintiff to limited use of her arms, no overhead work, and no work at or above shoulder height, [R846]; on August 18, 2008, Dr. Carantzas opined that Plaintiff could work but with limited used of the right arm, limited overhead work, and no heavy lifting, [R777]; on December 14, 2009, Mr. Ghaffari opined that Plaintiff could do sedentary to light work but would not, at the time, be able to perform her job duty on a full-time or sustained basis, [R882]; on December 16, 2009, Dr. Osborn opined that Plaintiff was capable of sedentary work, defined as lifting a maximum of ten pounds, occasionally lifting and/or carrying articles such as dockets, ledgers, and small tools, and doing a "certain amount" of walking and standing, [R713]; on December 12, 2011, Dr. Osborn opined that Plaintiff was capable of only part-time sedentary work, [R1497]; on October 12, 2012, Dr. Osborn opined that Plaintiff could do sedentary work with restrictions, pending surgery, [R1663]; following surgery on November 30, 2012, [R1699, 1725], Dr. Osborn opined on February 6, 2013, that Plaintiff remained unable to work, [R1698]; on April 23, 2013, Dr. Porter opined that Plaintiff could perform sedentary work but would not do well with any significant lifting or arm

49

movements, especially over her head, [R1828]; and on January 14, 2014, Dr. Porter opined that Plaintiff would have difficulty using her arms, [R1840]. In order to determine that the ALJ's decision was supported by substantial evidence, it must be clear the that ALJ took into account evidence both favorable and unfavorable to his opinion. *See McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (holding that an administrative decision is not supported by "substantial evidence" where the ALJ acknowledges only the evidence favorable to the decision and disregards contrary evidence). Obviously, the Court can reach no such conclusion here.

Moreover, as Plaintiff points out, an ALJ may not simply presume that a physician's opinion adopts the Commissioner's exertional definitions, *see* Social Security Ruling ("SSR") 96-5p, 1996 WL 374183 at *5 ("Adjudicators must not assume that a medical source using terms such as 'sedentary' and 'light' is aware of our definitions of these terms."), and there does not appear to be any support in the record for the ALJ's presumption that Dr. Osborn, Dr. Porter, and Mr. Ghaffari adopted the Commissioner's definition of "sedentary work" or "light work" when rendering the opinions at issue here, [*see, e.g.*, R713, 736, 751, 752, 844, 1353, 1878 (form defining sedentary work as lifting a maximum of ten pounds, occasionally lifting and/or carrying

50

articles such as dockets, ledgers, and small tools, and doing a "certain amount" of walking and standing and containing no option for "light work")].[44]

Additionally, as the Commissioner concedes, Plaintiff correctly points out that the ALJ did not state the weight he assigned any portion of Dr. Osborn's medical source statement other than the opinion regarding Plaintiff's expected absences, yet did not include in the RFC Dr. Osborn's opinions that Plaintiff would be off-task ten percent of the time; would need to be able to shift positions at will; would need to take unscheduled breaks and lie down every couple of hours; could only frequently reach in front of her body; could only occasionally grasp, turn, or twist objects, look down, turn her head right or left, or hold her head in a static position; and could only rarely look up.[45]  [R40; Doc. 12 at 10 n.2].   In certain cases, it is possible, as the

---

[44]    It also bears remark that when rejecting evidence *favorable* to Plaintiff—Dr. Osborn's November 2007 opinion that Plaintiff was not capable of working—the ALJ appeared well aware that working capability is an issue reserved for the Commissioner.  [*Compare* R40 *with* R43 (citing SSR 96-5p)].

[45]    Plaintiff concedes that the ALJ accommodated the limitations to frequent fingering and occasional overhead reaching and does not appear to challenge the ALJ's decision to omit the "low-stress" limitation from RFC.  [Doc. 11 at 13-15].  The ALJ also explained that he accorded "great weight" to the opinion of treating physician Dr. Porter that Plaintiff was capable of performing moderate-stress or "normal" work, [R31], thus supplying substantial evidence to support the decision to omit Dr. Osborn's "low-stress" restriction from the RFC.

Commissioner urges, to discern the reason an ALJ has discounted an opinion, even when the explanation is of less than ideal clarity. Here, however, the ALJ has ignored and mischaracterized evidence relevant to the rejected opinion: the objective medical findings of weakness, loss of sensation, and diagnoses of pain syndrome that the ALJ failed to consider certainly could support the uncredited non-exertional limitations appearing in Dr. Osborn's opinion. Moreover, records indicating limitation in the range of motion in Plaintiff's neck, [R1398 (11/9/08); R1374 (1/20/2010); R900, 1365, 1393 (4/5/2010); R1291, 1298, 1301 (9/2/11); R1433 (12/7/2011); R1830 (5/20/13); R1718-19 (1/25/2014); R1872 (1/7/2015)], and abnormal imaging, [R1347-48 (December 2010 MRI showing moderate cervical stenosis); R1876-88 (2015 MRI revealing a mild-to-moderate disk protrusion that was putting pressure on spinal nerves)], also appear to support Dr. Osborn's disregarded opinions of limitation, [R1682-87]. Thus, the Court is without a basis for finding that the ALJ's reasoning is based on substantial evidence. *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) ("We decline . . . to affirm simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making.").

Common sense dictates that a person with restrictions on the ability to look up or down, turn her head left to right, or hold her head in a static position is likely to be

prevented from working on a sustained basis as a cashier, order clerk, or cuff folder. *See also Jones v. Comm'r of Soc. Sec.*, Civil No. 11-748 (FLW), 2012 U.S. Dist. LEXIS 24506, at *12 (D.N.J. Feb. 27, 2012) (quoting the testimony of a VE, who stated that "when you're doing unskilled type of work at the light or sedentary level, you do have to move your head from side to side or up and down more than occasionally to get the job done"). Additionally, the Dictionary of Occupational Titles indicates that the positions of cashier, order clerk, and cuff folder each require "frequent" reaching, defined as an activity taking place from one-third to two-thirds of the time, [Doc. 11-3 at 3; Doc. 11-4 at 3; Doc. 11-5 at 3], which would exceed Dr. Osborn's limitation to bilateral grasping thirty percent of the time, [R1686]. Accordingly, the undersigned cannot conclude that the ALJ's failure to properly consider Dr. Osborn's medical-source statement was not harmless, and the decision of the Commissioner is therefore due to be reversed and remanded for further consideration at the administrative level.

## B. *Plaintiff's Credibility*

The ALJ stated that he did not find Plaintiff's contentions concerning her pain and associated limitations entirely credible because Plaintiff's treatment had been "essentially routine and/or conservative in nature," [R35, 38-39, 40]; she "ha[d] not

AO 72A
(Rev.8/8
2)

generally received the type of medical treatment one would expect for a totally disabled individual," [R40]; and her daily activities—brushing her teeth, bathing, putting on clothes, using a lightweight dust mop, loading the dishwasher, walking to the mailbox, visiting her mother with her sister, driving to doctor visits for forty-five minutes at a time, shopping, paying bills, handling a bank account, and counting change—were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations," [R32, 34, 42].

Plaintiff argues that the ALJ also erred in his consideration of her credibility. [Doc. 11 at 24-29]. First, she takes issue with the ALJ's statements that her care was routine and conservative and that she had not generally received the type of medical treatment one would expect for a totally disabled person, as the record shows that she had years of treatment by specialists, two back surgeries, multiple medications and treatments, and abnormal clinical findings. [Doc. 11 at 24-26]. Second, she questions how her daily activities exceed those that would be expected of a "totally disabled" person and argues that her limited activities are not inconsistent with the uncredited non-exertional limitations contained in Dr. Osborn's opinion and are paltry evidence of non-disability. [Doc. 11 at 26-27]. She also argues that the ALJ's credibility

analysis erroneously disregarded Dr. Adams's diagnosis of a pain disorder, [R1445-46], and its exacerbating effects on Plaintiff's perception of pain. [Doc. 11 at 27-28].

In response, the Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff's statements were not entirely credible. [Doc. 12 at 18-24]. She contends that the ALJ's finding that Plaintiff's statements were disproportionate to the objective evidence, [R40], is supported by evidence that x-rays showed Plaintiff was well healed after a 2007 surgery, [R520]; examinations showed no subluxations, [R1384], no clear motor or reflex deficits, and no overt myelopathy, [R1289], and full strength, normal coordination and balance, intact reflexes, and full bilateral shoulder motion without pain, [R1494, 1885]; an EMG confirmed only mild left-sided radiculopathy, [R1705]; Dr. Osborn repeatedly found Plaintiff had normal gait and normal lower extremities, [R1289, 1384, 1493, 1707]; Dr. Osborn opined on multiple occasions that Plaintiff could return to sedentary work, [R713, 1663, 1709, 1878, 1885]; and Dr. Porter opined that Plaintiff could do sedentary work "and probably light duty work," [R1828, 1843]. [Doc. 12 at 19-20] She also argues that the ALJ's finding that Plaintiff's treatments were generally conservative, [R40], despite the fact that Plaintiff had a spinal-fusion surgery during the period she alleges that she became disabled, [R1725], is supported by Dr. Osborn's opinion that Plaintiff's cervical

AO 72A
(Rev.8/8
2)

degenerative changes were not the cause of her pain, his recommendation of a trial of acupuncture, [R1384], and Plaintiff's failure to seek more aggressive treatment: her use of medication and her TENS unit only "on occasion," [R161, 1592]; Plaintiff's testimony that she only attended a few physical therapy treatments, [R144]; and her testimony that she had slowed the rate of trigger-point shots from Dr. Porter, [R145-46]. [Doc. 12 at 20]. The Commissioner also points out that the ALJ considered that Plaintiff's symptoms improved with treatment and medication, when used, [R41], as evidenced by her reports of improvement from trigger-point injections, [R777], pain medication, [R1246], massage therapy, a TENS unit, [R1441], and ice packs, [R157], and she contends that the activities of daily living the ALJ relied upon were concentration tasks that were inconsistent with Plaintiff's testimony about attention deficits due to pain and trouble sleeping, [R128, 133-35, 137, 155, 174, 480]. [Doc. 12 at 20-22]. The Commissioner further argues that the surgery taking place in 2007 undercuts Plaintiff's claim of disability because it occurred "many years before Plaintiff allegedly becoming disabled," [R391], "and even before she stopped working," [R462], thus establishing that Plaintiff was capable of working despite the condition. [Doc. 12 at 22]. The Commissioner also points out that the ALJ evaluated Plaintiff's pain condition and found that there were no limitations related to her mental conditions,

56

[R31], and Plaintiff has not pointed to evidence that the impairment caused functional limitations. [Doc. 12 at 23-24].

The Court does not reach the question of whether the credibility analysis supplies additional independent grounds for reversal, as it will be necessary, of course, to reevaluate the credibility of Plaintiff's allegations of pain and other limitations in light of a full and fair consideration of the medical record. *See* 20 C.F.R. § 404.1529(c) (providing that when evaluating the intensity and persistence of a claimant's symptoms, the Commissioner must consider the medical opinions and objective medical evidence, as well as the lay evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; other treatment received for the pain or other symptoms; any measures used to relieve the pain or other symptoms; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms); *Foote*, 67 F.3d at 1561-62 (providing that the credibility determination must be made in light of plenary review of a full, fairly developed record, and that where an ALJ does not credit a claimant's testimony as to her pain, he "must articulate explicit and adequate reasons for doing so").

57

It nevertheless bears noting here that the ALJ's credibility decision—and the Commissioner's defense of the ALJ's credibility decision—rely heavily on blatant mischaracterizations of the record: the ALJ's explanation that Plaintiff's "treatment has been essentially routine and/or conservative in nature," [R40], necessarily disregards that Plaintiff had back surgery in September 2007, [R613-14], and again on November 30, 2012, prior to her date last insured, [R1699, 1725]; likewise, the Commissioner's argument that Plaintiff worked after her first back surgery, [Doc. 12 at 22], is directly contradicted by the medical records showing that her on-the-job back injury kept her out of work from at least September 2007 until her employment was terminated in January 2008 when she remained unable to return to full-time work, [*compare* R462 *with* R520-21, 613-14, 674, 675]; and the Commissioner's suggestion that Plaintiff was "well-healed" two months after her first surgery, [Doc. 12 at 19; R41], is contradicted by unacknowledged treatment notes from the same visit, where Dr. Osborn observed that Plaintiff had pain at the extremes of range of motion of her neck, there was still subluxation and muscle spasm in the trapezius area, Plaintiff had diminished coordination of the left arm, reflexes were diminished in the left biceps and triceps, there was decreased sensation in the left hand, and motor strength was mildly diminished in the left arm, and Dr. Osborn opined that

58

Plaintiff "clearly" had sustained some nerve injury from the pressure of disk herniation against her spinal cord and exiting nerve roots and that it could "take some months or years to reach a point of maximum improvement and may or may not result in full recovery," [R520]. The ALJ also dramatically overstates Plaintiff's testimony regarding how often she drives: while Plaintiff testified that she drives "maybe" four times per month, [R137], the ALJ states that she testified that she drives four times per week, [R34].[46] A decision cannot be said to be supported by substantial evidence when it relies on statements that are patently untrue. *Flentroy-Tennant v. Astrue*, No. 3:07-cv-101-J-TEM, 2008 WL 876961, at *6, 8 (M.D. Fla. Mar. 27, 2008) (An "ALJ is required to build an accurate and logical bridge from the evidence to his or her conclusion."); *Baker v. Barnhart*, No. 03 C 2291, 2004 WL 2032316, at *8 (N.D. Ill. Sept. 9, 2004) (same).

The Court also finds it troubling that while the ALJ acknowledged Dr. Adams's diagnoses of pain syndrome, [R31; *see also* R690, 1445-46], and Dr. Porter's diagnoses of postlaminectomy pain syndrome and myofascial pain syndrome, [R37, 40; *see also*

---

[46] The evaluation of Plaintiff's activities of daily living is also far from clear, both because the activities are so limited as to be incapable of undermining much of Plaintiff's testimony and because the ALJ fails to explain how any particular activity undermines any particular claim of limitation. [R42].

AO 72A (Rev.8/82)

R20, 897, 1205, 1361-62, 1390-91, 1418, 1421, 1436, 1439, 1546, 1549, 1596, 1599, 1607, 1618, 1636, 1652-53, 1671, 1792, 1809, 1815, 1827, 1833, 1837, 1840, 1845, 1848, 1851, 1854, 1856, 1862, 1934, 1952, 1958], he does not appear to have considered the consistency of the opinions or to have considered the effect of the syndromes in combination with Plaintiff's physical impairments, which may explain—contrary to the ALJ's apparent perception—how Plaintiff could remain in such pain post-surgery, despite somewhat normal imaging. *See Jamison v. Bowen*, 814 F.2d 585, 589-90 (11th Cir. 1987) (explaining that the ALJ is required to demonstrate that he has considered all of the claimant's impairments, whether severe or not, in combination).

## VIII. CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion. The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 7th day of March, 2018.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE